[Nos. 40897-6-I; 41099-7-I. Division One. April 19, 1999.]

RONALD A. GRAYSON, *as Trustee, Appellant,* v. GEORGE PLATIS, ET AL., *Respondents.*

*Edwards, Sieh, Smith & Goodfriend, P.S.*, by *Catherine Wright Smith* and *Howard M. Goodfriend*; and *John W. Hathaway*, for appellant.

*Graham & Dunn*, by *John T. John* and *Estera F. Gordon*, for respondents.

GROSSE, J. — If a guarantor unconditionally promises payment of an obligation on behalf of a debtor, the guaranty is deemed absolute. And absent fraud or bad faith, an absolute guarantor has no recourse against the lender outside the provisions of the guaranty. The parties here altered the provisions of a guaranty so as to provide Harry Platis with a right to notice of actions resulting in impairment of collateral the Tanaka Trust held in consideration for the underlying loan. The extension of that right, however, did not carry with it the further duty that the Tanaka Trust act without negligence when attempting to preserve the collateral. The trial court exceeded the scope of the guaranty in so concluding. For this reason, we reverse and remand for recomputation of attorneys' fees.

## FACTS

This is an appeal and cross appeal from a partial sum-

mary judgment and jury verdict involving a $550,000 loan from the Tanaka Trust (the Trust) to George Platis. The dispute follows George's default, and centers around Harry Platis, George's brother and one of two guarantors of the loan.

In consideration for the loan, George gave the Trust a promissory note and irrevocably assigned to the Trust a $750,000 judgment (Johnson judgment), the proceeds of which the parties intended to apply to the loan balance. George secured the note with his stock in an automobile dealership, and his one-third interest in Cascade Ranches, Inc.

Platt, one of George's business associates, guaranteed 40 percent of the note in his capacity as president of Cascade Ranches. Platt also pledged a particular ranch owned by Cascade Ranches and personally indemnified the Trust from any loss in connection with the deed of trust to the ranch. Harry unconditionally guaranteed the remaining 60 percent of the loan, "individually" and on behalf of his law firm. Under the terms of his guaranty, the Trust was required to provide him with notice before releasing a guarantor, accepting additional or substituted security, or releasing or subordinating security for the loan.

When the loan came due, the Trust notified George that he was in default. George's attorney, Biagi, who had been responsible for collecting the Johnson judgment, agreed to continue his collection efforts on behalf of the Trust. When the Trust obtained rights to certain Johnson judgment properties, the Trust gave Biagi permission to transfer title to the properties to George, but with instructions to obtain from George first position deeds of trusts in favor of the Trust. Unbeknownst to the Trust, Biagi allowed George to give priority on the most valuable properties to a third party as security for a $200,000 loan. The Trust did not learn of the situation until several months later when George sought and obtained the Trust's cooperation in refinancing one of the properties.

The Trust obtained $97,860.11 on its second position

deed of trust from the refinance. When the property was sold some time later, the Trust received an additional $25,859.32, which it applied to the outstanding loan balance. The Johnson judgment transactions were conducted without notice to Harry.

Later, the Trust notified Harry of Platt's intent to pay off his 40 percent guaranty. Harry did not object to the release of Platt, but objected to the release of the ranch property Platt had pledged as security. He argued that the ranch was intended as the primary collateral for the entire loan. Indeed, in the loan package, the ranch was intended as security for the entire loan at the time Harry signed his guaranty. But when Platt signed his guaranty sometime later, he refused to sign until the documents were revised to reflect the ranch as security only for Platt's 40 percent guaranty.

Following Harry's objection, the Trust's attorney sent a letter to Harry stating that the Trust would not accept a payment by Platt in satisfaction of his guaranty unless Harry confirmed in writing that Harry's guaranty applied to the remaining balance due on the loan. Harry never responded. Even without a confirmation letter from Harry, however, the Trust accepted Platt's payment of $165,799.28, the amount due on his guaranty, and released Platt and the ranch.

Separately, the Trust released its interest in George's car dealership stock and gave George a second, one-year loan of $125,000, secured by George's interest in Cascade Ranches, Inc. The Trust further reclassified the $25,859.32 payment it received from the sale of the refinanced Johnson judgment property as a payment on the $125,000 loan rather than on the loan guaranteed by Harry.

Sometime later, the Trust brought an action against Harry, his marital community, and his law firm. After Harry filed a third party complaint against George and Biagi, the Trust amended its complaint to add a claim against George. The Trust and Harry immediately filed cross motions for summary judgment.

Among various rulings on the motions, the court held that the Trust was under no obligation to collect on the Johnson judgment, but when it undertook to collect the judgment through Biagi, it incurred an obligation to the guarantors to do so without negligence. The court held that it was a question of fact whether the Trust breached an implied covenant of good faith and fair dealing by applying Platt's payment only toward Platt's guaranteed portion of the loan. And the court held that it was a question of fact whether the Trust's and Harry's mistaken belief that the ranch would secure the entire loan was a basic assumption upon which the contract was made and materially affected the agreed exchange.

The court further held that it was a question of fact whether Harry's guaranty was an improper gift of community property, whether Alethea consented to the gift, and whether there was intent that the community receive some direct or indirect benefit from the guaranty. And the question of whether use of the word "individually" in Harry's guaranty precluded community liability was a question of fact as to the parties intent.

The jury found George liable on the two loans. The jury found Harry's marital community not liable, but found Harry partially liable for the amount owed by George. The jury further concluded that there was neither fraud nor a mutual or unilateral mistake as to a basic assumption of the contract. But they found that George and the Trust or its agents were each 50 percent responsible for damages to Harry as a result of negligent or intentional acts in connection with the Johnson judgment.

After offsetting Harry's award from the Trust's award, the court concluded that the Trust owed Harry $15,834.82. The court awarded Harry's marital community attorney's fees and expenses as a prevailing party. The court awarded the Trust fees, costs, expenses, and interest incurred collecting on George's note. The court held that neither Harry

nor the Trust substantially prevailed, so neither was entitled to an attorney fee award.

## DISCUSSION
### The Johnson Judgment

 Harry's guaranty of 60 percent of George's loan explicitly states that it was unconditional. Paragraph 3 of the payment guaranty provides:

> Guarantor hereby unconditionally guarantees and promises to pay to Lender or its order any and all indebtedness of Debtor to Lender and to perform any and all obligations of Debtor under the terms of any agreement or instrument evidencing, securing or executed in connection with the Loan ("Credit Documents").

In an attempt to escape liability under the guaranty, Harry makes several arguments, including the first, that the notice provision contained in paragraph 4 turned his otherwise unconditional guaranty into a conditional one.

> In such manner, upon such terms and at such times as it considers best and with notice to Guarantor, Lender may alter, compromise, accelerate, extend or change the time or manner for the payment of any indebtedness hereby guaranteed, increase or reduce the rate of interest thereon, release or add any one or more guarantors or endorsers, accept additional or substituted security therefor or release or subordinate any security therefor in accordance with the Credit Documents. No exercise or nonexercise by Lender of any right hereby given it, no dealing by Lender with Debtor or any other person, and no change, impairment or suspension of any right or remedy of Lender shall in any way affect any of the obligations of Guarantor hereunder or any security furnished by Guarantor or give Guarantor any recourse against Lender.

We disagree.

 " 'A conditional guaranty contemplates, as a condition to liability on the part of the guarantor, the happening of some contingent event *other than the default of the principal debtor* or the performance of some act on the part

of the obligee.' "[1] It is often defined as encompassing a duty on behalf of the creditor to attempt collection from the principal debtor before looking to the guarantor.[2] The unconditional nature of Harry's guaranty was not altered by the notice provision, which in fact did not condition Harry's liability on the receipt of notice. " 'A guaranty of the payment of an obligation, without words of limitation or condition, is construed as an absolute or unconditional guaranty.' "[3]

■ The unconditional nature of the guaranty is important because, except as provided by the guaranty, "though a loan may be inefficiently managed and with adverse consequences, neither inferior lienors nor absolute guarantors have any recourse against the lender unless it is alleged and proved that the lender acted in bad faith."[4] And there is no evidence here of bad faith or fraud by the Trust.

To overcome black letter law regarding unconditional guaranties, Harry next turns to equitable principles. He argued on summary judgment that the Trust's failure to realize on the Johnson judgment was akin to a refusal of tendered payment and operated to relieve him of his obligations under the guaranty.

> This *is not* an impairment of collateral defense claim or other defense that allegedly was waived by the terms of the Guaranty. The Assignment was not security. The Assignment was *additional consideration* to be applied to repay the Loan

[1]*National Bank v. Equity Investors*, 81 Wn.2d 886, 917, 506 P.2d 20 (1973) (citation omitted).

[2]*See Century 21 Prods., Inc. v. Glacier Sales*, 129 Wn.2d 406, 414, 918 P.2d 168 (1996) (" 'A conditional guaranty is an undertaking to pay or perform if payment or performance cannot be obtained from the principal obligor by reasonable diligence. . . . An absolute guaranty, unlike a conditional one, casts no duty upon the creditor or holder of the obligation to attempt collection from the principal debtor before looking to the guarantor . . . .' " (Citation omitted.)).

[3]*National Bank*, 81 Wn.2d at 918 (citation omitted).

[4]*National Bank*, 81 Wn.2d at 920; *see also Century 21 Prods.*, 129 Wn.2d at 415 (holding that when " 'the guaranty is absolute and unconditional *and does not require the creditor to take any action to preserve the security*, the creditor's failure to do so will not relieve the surety's obligation to pay upon default.' " (Citation omitted.)).

when received. Tanaka failed to credit the Loan when the additional consideration was received, but rather chose to abandon its rights to George, so Tanaka could avoid hassles and excise taxes. It is no different than returning cash payments to the Borrower without applying the funds to pay down the Loan. Tanaka's conduct caused damages to Harry by not having the Johnson Properties' value credited against the balance due on the Loan. . . .

. . . Tanaka's refusal to take title to the Johnson Properties is akin to a refusal of tender of payment on the Loan. Therefore, Tanaka's failure to realize the value of the Johnson Properties and credit those values to the Loan operates as a release of the defendants Platis as guarantors.

Although we disagree with the characterization of the Johnson judgment as consideration rather than collateral, which we note was the characterization contained in the agreement between George and the Trust, and was the characterization adopted by the trial court in its ruling on summary judgment, paragraph 8 of the guaranty states that guaranty extends without recourse to the refund of any payment.

With or without notice to Guarantor, Lender, in its sole discretion and at any time and from time to time either before or after delivery of any notice of revocation hereunder and in such manner, and upon such terms as it considers fit may: (i) apply any or all payments or recoveries from Debtor or from Guarantor or realized from any security, in such manner and order or priority as Lender elects, to any indebtedness of Debtor to Lender, whether or not such indebtedness is guaranteed hereby or is otherwise secured or is due at the time of such application; and (ii) refund to Debtor any payment received by Lender upon any indebtedness hereby guaranteed and payment of the amount refunded shall be fully guaranteed hereby.

As a result, Harry is without recourse.

■ The trial court adopted Harry's third argument, that the Trust owed him a duty implied in law, namely a duty derived from his status as a third party beneficiary of

George's assignment of the Johnson judgment to the Trust. The court concluded that the Trust had no obligation to collect on the Johnson judgment, but when it endeavored to do so, under a third-party beneficiary theory, the Trust incurred a duty to the guarantors to act without negligence. The court relied upon *Postlewait Construction, Inc. v. Great American Insurance Cos.*,[5] wherein the Supreme Court stated that a third-party beneficiary contract can be created when, construing the terms of the contract as a whole and in light of the circumstances under which it is made, performance under a contract would necessarily and directly benefit a third party.[6] No Washington case, however, has bestowed upon an unconditional guarantor third party beneficiary status. And we decline to do so here.

In fact, we have specifically limited claims by guarantors against lenders, including breach of good faith claims, to performance of specific contract terms.[7] And we have held, as a matter of law, that "a guarantor cannot rely upon the relationship between a lender and a borrower to create a fiduciary duty running from the lender to the guarantor."[8] In fact, specifically addressing a negligence claim by a guarantor against a lender, the Supreme Court stated in *National Bank*, "In the absence of fraud, if a guarantor unconditionally promises payment or performance of the principal contract, the guaranty is deemed absolute, unless by its terms a condition precedent to liability of the guarantor is created."[9]

■ But even assuming a duty of care in this case, Harry's waiver of all claims against the Trust operates to de-

[5] *Postlewait Constr., Inc. v. Great Am. Ins. Cos.*, 106 Wn.2d 96, 720 P.2d 805 (1986).

[6] *Postlewait*, 106 Wn.2d at 99-100.

[7] *See Miller v. U.S. Bank*, 72 Wn. App. 416, 425, 865 P.2d 536 (1994).

[8] *Miller*, 72 Wn. App. at 426.

[9] *National Bank v. Equity Investors*, 81 Wn.2d 886, 917, 506 P.2d 20 (1973); *see also Miller*, 72 Wn. App. at 425-26 n.5 (harmonizing *National Bank* with other case law "to mean that outside the provisions of the guaranty contract the major duty that a lender owes to a guarantor is the performance of the loan contract provisions in good faith").

stroy any liability. Following George's default, the Trust had a right to collect on the Johnson judgment and apply proceeds therefrom to the outstanding balance on the loan. The Trust did so. Granted, the Trust's failure to secure a first priority interest in some of the properties likely impaired Harry's subrogation ability. Nevertheless, paragraph 4 of Harry's guaranty states that "no change, impairment or suspension of any right or remedy of Lender shall in any way affect any of the obligations of Guarantor hereunder or any security furnished by Guarantor or give Guarantor any recourse against Lender." Paragraph 5 further provides in part:

> Guarantor waives and agrees not to assert or take advantage of . . . any defense or right based upon the acceptance by Lender or an affiliate of Lender of a deed in lieu of foreclosure, without extinguishing the indebtedness, even if such acceptance destroys, alters or otherwise impairs any subrogation rights of Guarantor or the right of Guarantor to proceed against Debtor for reimbursement, or both.

The Supreme Court has held enforceable these types of "hold harmless" clauses, absent fraud or deceit.[10]

The jury concluded that Harry failed to show fraud or deceit. And we hold that the language contained in Harry's guaranty was unconditional and sufficient to waive any right of recourse, thereby precluding a third-party beneficiary claim. Accordingly, we reverse and remand for a recalculation of damages. In doing so, we reject Harry's cross appeal regarding application of the Johnson judgment damages to offset his liability on the guaranty.

### The Platt Payment

When Platt proposed making a $165,000 payment on the loan, which was equivalent to his guaranty of 40 percent of the outstanding loan balance at that time, the Trust informed Harry of its intent to release Platt and the ranch

---

[10]*National Bank*, 81 Wn.2d at 918-19.

securing his guaranty. When Harry objected to release of the ranch, the Trust's attorney stated in a letter to Harry that the Trust would treat the payment as a payment from George. Later, however, the Trust applied Platt's payment solely to Platt's share of the outstanding debt.

Harry does not claim that the Trust exceeded its authority under the guaranty when it released Platt.[11] Instead, he argues that the Trust acted in bad faith when it told him that it would apply Platt's payment to the entire loan balance and then did not do so. Apparently accepting the argument that the Trust's actions constituted a breach of an implied covenant of good faith and fair dealing, the jury reduced Harry's liability by sixty percent of Platt's payment.

But the letter from the Trust's attorney, agreeing to treat Platt's payment as a payment from George, was merely gratuitous. Under paragraph 8 of the guaranty, the Trust could apply payments from Platt in the manner of its choosing, with or without notice to Harry. And more importantly, Harry fails to explain how he detrimentally relied on the letter.

As a result, there was not substantial evidence in the record to support the jury's verdict that the Trust breached the implied covenant of good faith and fair dealing, or even to support the court's decision to submit the issue to the jury. Accordingly, we reverse the award and reject Harry's cross appeal on the issue of application of the Platt payment.

## Marital Liability

■ The Trust argues that the trial court erred when it

---

[11]*See* Br. of Resp'ts, at 51-52, stating:

In connection with the payment, Tanaka released Platt's guaranty, reconveyed the Ranch deed of trust, released its security interest in the GPI [George Platis, Inc.] stock and made a new $125,000 loan to George, secured by George's interest in Aeneas Valley. Ex. 166. But those actions were not the foundation of Harry's defense.

instructed the jury that Harry's marital community could escape liability based on Harry's subjective intent and erred in refusing to hold Harry's marital community liable as a matter of law. The court's instruction was as follows:

> A guaranty by the marital community is a transfer of community property—specifically, a transfer of community credit. A transfer of community property is a gift when it is made without the intention or expectation that the community will receive a[n] economic benefit as a result of the transfer. Neither spouse may transfer community property by gift without the express or implied consent of the other spouse.
>
> A guaranty obligation of one spouse creates a presumption of community liability. However, the presumption may be rebutted by clear and convincing evidence that the parties agreed in the guaranty contract that the spouse signing the guaranty was incurring only a separate obligation. If there is such evidence, you will disregard the presumption.
>
> The presumption of community liability may also be rebutted by clear and convincing evidence that the spouse who entered into the guaranty obligation did so without the intention or expectation that the community would receive a material economic benefit from the guaranty. If there is such evidence, you will disregard the presumption.
>
> The intent or expectation to incur only a separate obligation or to receive a community benefit is determined as of the date the guaranty contract was made.

The Trust's primary objection to the instruction is an objection to language used in paragraph 3.

In *Rainier National Bank v. Clausing*,[12] however, we stated, "The presumption [that a surety obligation of one spouse creates community liability] may be rebutted by a showing that the spouse who incurred the debt or obligation did so without 'the intention or expectation, at the inception of the transaction,' . . . that a material economic

---

[12]*Rainier Nat'l Bank v. Clausing*, 34 Wn. App. 441, 661 P.2d 1015 (1983).

benefit would accrue to the community.' ''[13] The court's instruction here, which addressed the evidence needed to rebut the presumption of marital liability, as opposed to the evidence required to support a finding as to the parties intent, was a correct statement of the law.

Substantial evidence also supports the jury's conclusion that Alethea did not consent to the transaction and the parties did not intend to hold the marital community liable. Alethea did not sign the agreement, Harry clearly expressed the desire not to bind the marital community, Harry signed the guaranty "individually," and paragraph 14 of the guaranty states that a married person who signs the guaranty agrees that recourse may be had against "separate property." While each of these facts standing alone may be insufficient evidence of the parties intent, viewing the evidence in its entirety and in light most favorable to Harry, the evidence is sufficient to support the jury's verdict.

Moreover, while Harry's marital community may have *actually* benefited from the transaction, the essential question is whether that benefit was *intended* at the transaction's inception. And the jury's factual determination that a benefit was not intended is entitled to great deference on appeal. Accordingly, we affirm the jury's determination that the parties intended to limit liability to Harry's separate property.

### Attorney Fee Award to the Marital Community

█ After voluntarily dismissing its claims against Alethea's separate property, the Trust pursued its claims against Harry separately and against the marital community composed of Harry and Alethea. The jury found Harry separately liable on the guaranty, but concluded that the guaranty did not bind the marital community. The Trust argues that a marital community is not a separate

---

[13]*Rainier Nat'l Bank*, 34 Wn. App. at 445 (quoting *Warren v. Washington Trust Bank*, 19 Wn. App. 348, 360, 575 P.2d 1077 (1978)).

legal entity entitled to a fee award as a prevailing party. But the fees at issue here were not awarded to the marital community, but to Alethea, in defense of it.

A spouse can bring an action on behalf of a marital community, and may defend an action on their own behalf or on behalf of their spouse.[14] We have previously stated that the spouse or spouses, if both join, are the parties to an action, not the community on whose behalf the action is brought.[15] The spouse representing a marital community is entitled to attorney's fees where the community prevailed in an action to enforce a contract providing for attorney fees, even though their spouse's separate estate is found liable.[16]

The court here awarded attorney's fees to "Alethea Ann Platis, on behalf of the marital community of Alethea Ann Platis and Harry B. Platis," rather than to the marital community itself. A judgment against a marital community must reflect the party's representative capacity or risk subjecting the husband or wife to individual liability as well.[17] As a result, the court correctly awarded fees under RCW 4.84.330 to Alethea, in her capacity as the representative of the marital community's interests.

As for the amount of the award, the attorney for the marital community submitted an affidavit stating that the community incurred $199,920 in attorneys fees solely related to the marital community liability issue. The community also requested 57 percent of the total costs, or $22,866.10. The court awarded $200,220 in fees and

---

[14]RCW 4.08.030 and RCW 4.08.040.

[15]*Vasey v. Snohomish County*, 44 Wn. App. 83, 91, 721 P.2d 524 (1986).

[16]*See Klaas v. Haueter*, 49 Wn. App. 697, 708, 745 P.2d 870 (1987).

[17]*See, e.g., Davies v. Carey*, 72 Wash. 537, 542, 130 P. 1137 (1913) (holding a judgment against husband and wife erroneous in sofaras it awarded recovery against a wife individually, rather than solely as a member of the marital community).

$12,034.79 in expenses. The court's award was not an abuse of discretion.

## CONCLUSION

We affirm the community liability judgment and community damages award, reverse the negligence and breach of good faith judgments, remand the Trust's damages award against Harry for recomputation, deny Harry's cross appeal, award prevailing party status on appeal to the Trust (re: Harry), and the community (re: the Trust).

AGID, A.C.J., and COLEMAN, J., concur.

Review denied at 138 Wn.2d 1020 (1999).

